The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable Court. Be seated. Good morning, everyone. The first argued case this morning is No. 2010-3007, Alston v. SSA. Mr. Richard. Good morning. May it please the Court. The issue before the arbitrator was whether the Social Security Administration violated 5 U.S.C. 4302 and its own opportunity to perform successfully their OPS procedures when it removed the petitioner, Mr. Alston, from federal service. The issue before the Court today is whether there was substantial evidence to support the arbitrator's decision that SSA did not rely on quantified or numerical performance standards to rate and evaluate Mr. Alston's performance. Can I ask you, in your view, just generally, creating the standard review or whatever, what should the agency have done that it didn't do? I think in this situation, what the agency should have done was give Mr. Alston the percentage value that would have given him a satisfactory, successful performance level. Sort of like they do in elementary school, grade school, where they give you an 80% as a B, a 90% as an A, and so forth. And I think in this situation, the evidence supports that fact, that they did rely on some numerical percentage value to indicate or to show to Mr. Alston that his performance was at an unsuccessful level. If they were able to show a poor performance level or poor performance percentage rate, we contend that they should have been able to give him a successful percentage rate or performance level to attain. I guess I'm not entirely clear what you're saying. Is your complaint that they used numbers at all, or that they didn't tell him what the numbers were, so he didn't know what was expected of him? The latter. That they did not give him the knowledge to attain, or they didn't give him the knowledge of the level that he needed to attain in order to keep his job. So there would only be harmful error if he had a reasonable expectation that producing one case a day at the 72% error rate or whatever it was would be unacceptable. That's correct. Well, the standards that existed said something about fair share, right? That's correct. And is there any basis for him concluding that one case a day at that error rate was a fair share of the work? No, there was not. But there also wasn't any indication of what would be a fair share of work. I mean, he wouldn't know what a fair share of work would be until the work was done for the month or the week whenever they decided to review. Well, here, though, there's a continuing saga for over, I think, over a year where they were working with special improvement plans, and people were working with him and giving him training. It's not like he was a regular worker and he came in one day and said, You haven't been producing enough. You're out of here. I mean, there was a constant training and working with him to improve his skills. Well, it's debatable if there was a constant. I mean, there was an argument that we made before the arbitrator that the agency lacked mentorship for him, and we definitely put up an argument for that as well. But to your point, there is a stop. There was a period of time longer than a few months. So he knew he had problems, and he generally knew the area of his problems, right? I mean, they were working with him on improving his skills and knowledge so that he could complete more applications with fewer errors. Well, again, and that's not the argument for the court, but to address that, we made several arguments that he was not getting the training that he felt was necessary. For example, we made arguments before the arbitrator that when he would contact or attempt to contact his mentor, the mentor was unavailable. There was a very limited window for Mr. Austin. But the arbitrator rejected those arguments. That's correct. And really, the argument that we have is the agency was entitled, really, and obligated by law to communicate the standards to the maximum extent possible and feasible. And we believe that the agency did, in fact, have those numbers. They had some rate or percentage value in tandem with the amount of cases that he was supposed to complete in a given day. And they could have articulated that. It would be very simple to do so, to say, Mr. Austin, if you would maintain an 80 percent, doing five cases a day for four months, you will keep your job. That's a very simple standard to put forth. And that's all they needed to do. That's the end of it. Thank you. Okay. Thank you, Mr. Richard. Mr. Austin. Thank you. May it please the Court. This Court should affirm the arbitrator's decision sustaining the Social Security Administration's removal of Mr. Austin because the decision is supported by substantial evidence. The primary issue that Mr. Austin raises upon appeal is that the Social Security Administration established a numerical or quantitative standard for acceptable performance that was not communicated to Mr. Austin. The arbitrator found otherwise. Because the agency established no numerical or quantitative standard for acceptable performance, it had no obligation to communicate this nonexistent standard. So what was the standard? As Your Honor indicated in your questions, he had to do a fair share of the work at an acceptable error level with a timely performance in terms of when the cases had to be done for all the different types of cases that they had. But it seems to me, I mean, if nobody could possibly assign a number to that and that was never communicated, I mean, it seems to me like the problem there is that he doesn't know what he's supposed to do in order to be successful, right? Well, it's not that a number could not have been assigned. And I think Your Honor is getting directly to the issue in the Wilson case where the Court addressed the question of is an agency required to have a precise numerical or quantitative standard? And what this Court said in Wilson was that the answer to that is no, it doesn't have to be. Well, the question is, I don't know what precise means in this context. But if I come in and I'm an employee and the standard says you've got to do a fair share at a pretty good level, and I ask you, well, does that mean I have to produce 100 cases a day or does that mean I have to produce one? I mean, is there some basis for knowing generally what a fair share is? Well, yeah, a fair share is basically what other employees are doing. And that's what's meant by the concept of fair share. So if you're doing, you know, about what your other employees are doing, then you're doing your fair share. And there's other elements of it, too. You have to do, you know, have a reasonable accuracy rate. There was testimony in the record that we cited in our brief how important accuracy is in these cases because you could have, you know, somebody getting, you know, one-third of their Social Security benefits for 30 years if it's inaccurate. But fair share allows the agency to have some flexibility. And we agree with the claim that if, in fact, there was a definition of fair share that, you know, you have to do 4.2 cases or your performance is unacceptable, that that had to be communicated to Mr. Alston. But there was no such standard set. And the record's unrebutted on that. The testimony was it can vary from week to month. It allows the agency for an employee like Mr. Alston who had a good attitude and he tried. And, in fact, the first element was interpersonal skills. And all his ratings in that category were very positive. So the agency here wanted to give him every chance. And to have an arbitrary standard, which is what Section 4302 is really all about, Section 4302 says that the standard should not be arbitrary. And one of the reasons for having a very objective standard is so it can't be arbitrary. But here, if you have a precise standard of, say, 4.2 with a 96.3 percent accuracy rate, and somebody's just under that, then that's even more arbitrary because that employee, who the agency might otherwise want to keep on, would have to be rated as unacceptable because he's not meeting this quantitative or zero standard. So is your position because the numbers here are so extreme? I mean, it would be a different case if he was producing 3.5 with an error rate of 9 percent, right? And he was determined to be unacceptable? Right. Well, I don't think it would be a question there of whether the standard was reasonable. Then you get to is there substantial evidence to fire him. If he's doing so close to what the average employee is doing, is that substantial evidence that he's not doing his fair share of the work? And if the agency wanted to terminate him on that basis, they'd have to show that that's reasonable. Here, Your Honor's right. We know that what he did, 0.73 cases when an average employee is doing 4 or 5, and a relatively high error rate, was unacceptable. So we don't really have that issue, nor is the claimant contending that he did that. But the standard itself gives the agency the flexibility, and that's precisely what the court was addressing in Wilson and also in Atkins, where the court said there can be subjectivity, and, in fact, we want to give the agency the ability to have subjectivity. The whole purpose of the statute is to Subjectivity in what sense, so that people who are trying really hard, even though they're not doing as well, can still be highly rated? That's certainly one area. Another area would be, for example, in this case, the Social Security Administration has a number of different cases that come up, and at one point Mr. Alston indicated he was having difficulty with self-employment and household cases. Well, maybe if there's just one particular area of cases that an employee is having difficulty in that's bringing his accuracy rate down and bringing his production rate down, then the agency would have the flexibility to keep that employee employed to see if we can correct this one narrow area and bring everything up. So it gives them the flexibility. If you had an arbitrary standard or a mandatory numerical quantitative standard, then you wouldn't have that flexibility, and I think what this court said in Wilson was looking at the progression of history. They wanted the agency to have the flexibility for it to determine what is the best standard for that agency to have to evaluate employees. And is it the government's position that even in the absence of a numerical standard, there was little ambiguity in terms of what was communicated to him as to what was expected or why his performance was deficient? In this particular case, yes, that is our position, because in this particular case not only do we have the performance evaluations, we have the performance assistance plan where he was given a mentor and given an evaluation period and we're given an opportunity to perform successfully where he was given an additional training and mentor period to look at his performance and work on all these things, and yet he still couldn't perform. This is not the case that I know this court often sees of problems with employees' attitude or misconduct. This is clearly simply a performance plan. Mr. Alston simply was unable to do this very difficult job, and he has a good attitude and he was the type of employee that the government wants, but not for this job, and it's just unfortunate. And I think the agency wanted to keep him on. I think the agency, you know, they extended the performance assistance plan. They extended the opportunity to perform successfully time periods for him to try to meet the standards, and he just couldn't. He wasn't really close to whatever the standard was, you know, in terms of its quantitative, there wasn't a quantitative standard, but he wasn't doing his fair share. And the standard also, the statute also says it's very important to communicate to him what has to be done. He knew that he had to improve his quantity. He knew that he had to improve his accuracy. He knew that he had to improve his case management in terms of performing, finishing the cases in a timely manner. The record contains evidence that at one point, it came in in May, the management came in in May of 2008. There were a whole stack of cases that were months overdue, and not only had he not done his work on time, but he hadn't notified management he had those cases. Then they come back a month later, and there's 59 more cases there. And, you know, we don't know why that happened, whether he just lost track of the cases or whether he was embarrassed that, you know, he wasn't able to do it. But he couldn't do the job. I mean, he just couldn't work independently. And the other point I want to make is that even if we believe this standard was sufficiently objective to meet the statutory requirements as defined by the Wilson case, but even for whatever reason it didn't, it only goes to the third element, which is achieved business results, which is where this fair share standard is. It's a performance standard of that critical element. There's two other critical elements, the participation element and the demonstrates job knowledge element, which he also failed to meet. And those two elements go more to the job skills that are required to perform successfully on the job. The participation looked more at his ability to work independently, and the demonstrates job knowledge was more of, you know, do you know the procedures and the requirements of the agency? And he failed both of those or performed unsuccessfully in both of those. And it's not surprising that somebody who does not have the job skills is then going to fail the achieved business results because it's logical if you don't have the job skills, you're not going to achieve the results. But there's still three separate elements. And the claimant argues there's really only one element. No, there's three. The mere fact that you can't meet two means it's logical you're not going to meet the third. It does not mean there's only one element because if you are meeting the first two and you're still not achieving business results, then you have to wonder why. Is he daydreaming? Is he not doing his job? You know, there's still separate elements. And in his case, it wasn't an attitude problem. It was simply he did not have the job skills, was not capable of performing his job, and therefore he missed all elements. And under the Marvin case, if you fail to meet even one critical element, that's a sufficient basis for the agency to determine you. And it only has to be supported before the arbitrator by substantial evidence, not just before this Court but before the arbitrator. And unless the Court has any other questions for these reasons, we would ask that this Court affirm the decision of the arbitrator because it is supported by substantial evidence. Any questions? No questions? Okay. Thank you, Mr. Austin. Mr. Richard? Again, I'd just like to say that really what's at the heart of this issue is how is Mr. Austin's performance being measured? And the agency, I think the record is very clear that on four separate occasions, the agency measured Mr. Austin's performance on this numerical or quantitative performance standard. You have the performance assessment plan, which is the PAC, in that they directly discredit Mr. Austin's performance at 65 percent, and that's the basis for putting him on the PAC. So his accuracy rate was 65 percent, and he needed to boost it up to get it higher to some level. The level in this case is unknown. Mr. Austin does not know what that level is. So they put him, the agency puts Mr. Austin on a performance assessment plan because of poor accuracy. Then later he fails because he doesn't reach a certain number. He doesn't know what that number is, but apparently the agency does. Then they put him on an opportunity to perform successfully plan, OPS. Again, they discredit that Mr. Austin is performing at a lower rate than what he is required to perform at. They state 61 percent explicitly, and they state as the basis for the OPS that he is performing at a 61 percent rate. Therefore, he intuits that he needs to boost up his performance or his accuracy rate. He doesn't know what level he has to attain. When the OPS is over, when it's too late, the agency does propose to remove him. Again, they cite 64 percent, 67 percent, 62.5 percent accuracy rate. Again, without ever explicitly stating what Mr. Austin was supposed to attain in order to save his job. It's not until they actually decide to remove Mr. Austin where they indicate some level that Mr. Austin was supposed to attain in order to keep his job. In there they indicate an 80 percent. Finally, in order for management to consider your performance successful under the OPS plan, you must demonstrate consistent, sustained improvement at an acceptable level. Although you had a few weeks with an appropriate 80 percent average, you did not sustain those levels while completing a fair share of the work. During those few weeks, you were still completing less than one case per day. I think this is direct evidence that the agency is using some standard, a quantitative numerical standard that they have in their head. Mr. Austin needed to attain in order to save his job, but they did not communicate that. Counsel is correct that the agency does not have to have, there's no law that binds them or regulation that binds them to implementing a quantitative or numerical standard. But there is law out there that states that once they do, they have to convey that and communicate that to the employee. And in this sense, they did. The agency did in fact, I think that's evidence of the PAP, the OPS proposal to remove and the decision to remove, is all clear evidence that the agency did base and measure Mr. Austin's performance on some quantified and numerical standard. And they did not communicate that to Mr. Austin. And if the court does have any further questions, I'd like to answer those. Any more questions for Mr. Richards? Thank you very much. Thank you, Mr. Richards and Mr. Austin. The case is taken under submission.